UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
                                                         :
UNITED STATES OF AMERICA,                                :
                                                         :
-against-                                                :          **REPORT AND RECOMMENDATION**
                                                         :               14-CR-556 (WFK) (VMS)
GENNARO BRUNO                                            :
      also known as "Jerry,"                           :
                                        Defendant.       :
                                                         :
-------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

      Defendant Gennaro Bruno (the "Defendant") moves, in an omnibus motion, for a bill of

particulars, to compel discovery, to dismiss several counts of the indictment[1] and to inspect the

grand jury minutes.  See generally 8/12/2015 Def.'s Mot. for Bill of Particulars, Mot. for

Discovery, Mot. to Dismiss for Lack of Jurisdiction, Mot. to Dismiss on Speedy Trial, and Mot.

to Inspect Grand Jury Minutes (hereinafter "Def.'s Mot."), ECF No. 53.  The Honorable William

F. Kuntz, II, referred the motions to this Court for a report and recommendation.  8/18/2015

Order, ECF No. 55.  Oral argument was held before this Court.  See generally 10/22/2015 Tr. of

Oral Arg. (hereinafter "10/22/2015 Tr."), ECF No. 72.  At oral argument, Defendant withdrew

his motion for discovery.  10/22/2015 Minute Entry, ECF No. 69.  For the reasons stated herein,

this Court respectfully recommends that the District Judge deny Defendant's remaining pretrial

---

[1] Defendant did not make his three motions to dismiss pursuant to any specific Federal Rule of
Criminal Procedure.  The Court interprets these motions as Rule 12(b) motions.  Rule 12(b)
states that "[a] party may raise by pretrial motion any defense, objection, or request that the court
can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  The Court notes that it
must take the allegations of an indictment as true when deciding a motion to dismiss.  See Boyce
Motor Lines v. United States, 342 U.S. 337, 343 n.16 (1952).

motions in their entirety.

## I.    Background

### A.    Defendant's Current Indictment

On October 16, 2014, a grand jury in the Eastern District of New York returned a fifteen-

count indictment charging Defendant with:

> Racketeering conspiracy and racketeering in or about and between 2000 and October 2014 (Counts One and Two);
>
> Conspiracy to import and conspiracy to distribute marijuana in or about and between 2000 and 2011 (Counts Three and Four);
>
> Using, carrying, and possessing a firearm in connection with violent and drug trafficking crimes in or about and between 2000 and 2011 (Count Five);
>
> Causing the death of Martin Bosshart through the use of a firearm on or about January 2, 2002 (Count Six);
>
> Murder of Martin Bosshart in aid of racketeering on or about January 2, 2002 (Count Seven);
>
> Murder of and conspiracy to murder Martin Bosshart on or about January 2, 2002 while engaged in narcotics trafficking (Counts Eight and Nine); and

Various counts of obstruction of justice in or about and between 2009 and October 2014,

including:

> Conspiracy to prevent testimony (Count Ten);
>
> Attempt to prevent testimony (Count Eleven);
>
> Conspiracy to prevent communication of information to a law enforcement officer (Count Twelve);
>
> Attempt to prevent communication of information to a law enforcement officer (Count Thirteen);
>
> Conspiracy to obstruct an official proceeding (Count Fourteen); and
>
> Attempt to obstruct an official proceeding (Count Fifteen).

10/16/2014 Indictment (hereinafter "EDNY Indictment" or the "Indictment") ¶¶ 16-60, ECF No. 1.

The racketeering and racketeering conspiracy charges allege that Defendant is a member of the enterprise, the "Corozzo Faction within the Gambino organized crime family of La Cosa Nostra."  EDNY Indictment ¶ 1.  The enterprise operated within the Eastern District of New York and elsewhere.  Id.  The Indictment describes in detail the highly organized hierarchy of the Gambino Crime Family.  The head of the family was known as the "boss," who was assisted by an "underboss" (or "consigliere") that administered the supervision, support, protection and discipline of the lower-ranking members of the crime family.  Id. ¶ 4.  Beneath this administrative level were numerous "crews" (also known as "regimes" or "decinas") headed by "captains" (also known as "skippers," "caporegimes," or "capodecinas").  Id. ¶ 5.  The crews were comprised of "soldiers" and "associates."  Id.  Each "captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection."  Id.  In return, captains received a portion of their crews' earnings.  Id.  The enterprise consisted of multiple associates, members and crews of the Gambino family who maintained an alliance with Joseph Corrozzo ("Mr. Corrozzo") and other associates, members and crews under Corozzo's oversight and control.  Id. ¶ 6.

As described in the EDNY Indictment, associates were sometimes recruited from loosely structured crews of young men which often operated under the control or with the acquiescence of the Gambino Crime Family, but which did not constitute lower levels of authority within the Gambino Crime Family and were outside the Gambino Crime Family hierarchy and structure. Id. ¶ 8.  One of these crews, referred to as the "Young Guns" or "Liberty Posse," operated in Ozone Park, Queens, and was controlled by Ronald Trucchio, who was at various times an

associate, soldier and captain of the Gambino Crime Family.  Id. ¶ 9.  Yet, the Young Guns

functioned self-sufficiently and without oversight.  Id. ¶ 8.  The Young Guns crew was not

associated with the enterprise and no longer exists.  Id. ¶ 9.

The purpose of the enterprise was to generate money via various criminal activities,

including drug trafficking, robbery, extortion, illegal gambling and loansharking.  Id. ¶ 11.  The

enterprise "also furthered [its] activities by threatening economic injury and using and

threatening to use physical violence, including murder."  Id.  Defendant was a Young Guns

member in the 1990s and then became an associate after serving a prison term from 1997 to

2000.  Id. ¶ 15.

The racketeering conspiracy charge in Count One and racketeering charge in Count Two

allege that Defendant participated in a pattern of racketeering in furtherance of the enterprise's

affairs.  Id. ¶ 18.  Specifically, Counts One and Two charge that Defendant, together with others,

conspired to commit or actually committed the following acts:

1. Conspiracy to import marijuana and importation of marijuana, a Schedule
   I controlled substance, in or about and between 2000 and 2010 within the
   Eastern District of New York and elsewhere in violation 21 U.S.C. §§
   952(a), 960(a)(1), 960(b)(1)(G) and 963 and 18 U.S.C. § 2.  Id. ¶¶ 19-21.

2. Conspiracy to distribute marijuana and distribution of marijuana, a
   Schedule I controlled substance, in or about and between 2000 and 2011
   within the Eastern District of New York and elsewhere in violation of 21
   U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii) and 846 and 18 U.S.C. § 2.  Id. ¶¶
   22-24.

3. Conspiracy to distribute and distribution of Valium, a Schedule IV
   controlled substance, in or about and between 2000 and 2003 within the
   Eastern District of New York and elsewhere in violation of 21 U.S.C. §§
   841(a)(1), 841(b)(2) and 846 and 18 U.S.C. § 2.  Id. ¶¶ 25-27.

4. Conspiracy to murder and murder of Martin Bosshart on or about January
   2, 2002 in the Eastern District of New York and elsewhere in violation of
   New York Penal Law ("N.Y.P.L.") §§ 125.25(1), 105.15 and 20.00.  Id. ¶¶
   28-30.

5. Conspiracy and attempted Hobbs Act extortion of a waste carting company in Queens, New York in or about and between 2000 and 2003 within the Eastern District of New York and elsewhere in violation of 18 U.S.C. §§ 1951(a) and 2. State law extortion and attempted state law extortion in or about and between 2000 and 2003 within the Eastern District of New York and elsewhere in violation of N.Y.P.L. §§ 155.40(2), 155.05(2)(e)(i), 155.05(2)(e)(ii), 110.00 and 20.00. Id. ¶¶ 31-35.

6. Conspiracy and attempt to prevent testimony of John Doe #2 in an official proceeding in or about and between 2009 and October 2014 within the Eastern District of New York in violation of 18 U.S.C. §§ 1512(b)(1), 1512(k) and 2. Conspiracy and attempt to prevent communication of information to a law enforcement officer in or about and between 2009 and October 2014 within the Eastern District of New York in violation of 18 U.S.C. §§ 1512(b)(3), 1512(k) and 2. Conspiracy and attempt to obstruct an official proceeding in or about and between 2009 and October 2014 within the Eastern District of New York in violation of Title 18 U.S.C. §§ 1512(c)(2), 1512(k) and 2. Id. ¶¶ 36-42.

As stated above, Defendant filed an omnibus motion on August 12, 2015. Def.'s Mot. In his motion, Defendant moves:

(1) for a bill of particulars for Counts One through Five and Ten through Fifteen (id. at 6-9);

(2) for disclosure of the recordings the Government intends to use at trial (id. at 10-12);

(3) to dismiss Count One (racketeering conspiracy) as barred by double jeopardy (id. at 12-20);

(4) to dismiss Counts One through Nine as barred by Defendant's 2004 Southern District of Florida plea agreement (id. at 20-28);

(5) to dismiss Counts Six through Nine due to pre-indictment delay (id. at 28-31); and

(6) for the Court to examine the grand jury minutes in camera to determine if the grand jury was misled with regard to Counts Six through Nine (id. at 31-37).

The Government opposes the omnibus motion for the reasons discussed below. See generally Gov't Mem. of Law in Opp'n to Def.'s Mot. (hereinafter "Gov't Opp'n"), ECF No. 59. As previously stated, at oral argument, Defendant withdrew his motion for Government disclosure

of the recordings it intends to use at trial because the Government agreed to turn over transcripts of the recordings as they are available and have been reviewed. 10/22/15 Tr. at 19-20.

As two of Defendant's motions to dismiss involve an indictment of Defendant presented by, and plea agreement by Defendant entered into with, the United States Attorney's Office ("USAO") for the Southern District of Florida ("SDFL"), the Court first discusses the SDFL Indictment and plea agreement before addressing the merits of the parties' arguments.

**B.      Defendant's Previous Indictment And Guilty Plea In The Southern District Of Florida**

In 2004, Defendant was charged by the USAO for the SDFL with racketeering conspiracy in a one-count indictment. SDFL Third Superseding Indictment, Ex. 3 to Def.'s Mot. (hereinafter "SDFL Indictment"). He ultimately pled guilty to the count of racketeering conspiracy in violation of Title 18, United States Code, Section 1962(d). SDFL Plea Agreement, Ex. 4 to Def.'s Mot.

In the SDFL Indictment, the charged enterprise in the racketeering conspiracy was a crew "operating under the control of the Gambino Organized Crime Family." SDFL Indictment ¶ 8. The crew was specifically identified as the "Young Guns" or "Liberty Posse," which is a crew also described in the EDNY Indictment. Id. ¶ 7; EDNY Indictment ¶ 9. The racketeering conspiracy ran from 1986 to July 21, 2004, and the racketeering activities were committed in New York City, the Southern District of Florida and elsewhere. SDFL Indictment ¶¶ 9, 14. Ten individuals, including Defendant and Ronald Trucchio, were charged as members of this enterprise. Id. ¶ 8. The pattern of racketeering outlined in the indictment included the following acts:

> 1.  Murder, attempted murder, and conspiracy to commit murder in violation of §§ 782.04 and 777.04 of the Florida Statutes and N.Y.P.L. §§ 125, 110, and 105. Id. ¶ 10(a).

2. Robbery, attempted robbery, and conspiracy to commit robbery in violation of §§ 812.13 and 777.04 of the Florida Statutes and N.Y.P.L. §§ 160, 110 and 105. Id. ¶ 10(b).

3. Arson, attempted arson, and conspiracy to commit arson in violation of §§ 806.01 and 777.04 of the Florida Statutes. Id. ¶ 10(c).

4. Extortion, attempted extortion, and conspiracy to commit extortion in violation of §§ 836.05 and 777.04 of the Florida Statutes and N.Y.P.L. §§ 155, 110, and 105. Id. ¶ 10(d).

5. Kidnapping, attempted kidnapping, and conspiracy to commit kidnapping in violation of N.Y.P.L. §§ 135, 110 and 105. Id. ¶ 10(e).

6. Conspiracy, attempt, and dealing in controlled substances and listed chemicals in violation of §§ 893.13 and 777.04 of the Florida Statutes and N.Y.P.L. §§ 220, 110, and 105. Id. ¶ 10(f).

7. Tampering with a witness in violation of 18 U.S.C. § 1512. Id. ¶ 10(g).

8. Retaliating against a witness in violation of 18 U.S.C. § 1513. Id. ¶ 10(h).

9. Fraud and related activity in connection with access devices in violation of 18 U.S.C. § 1029. Id. ¶ 10(i).

10. Interstate travel in aid of racketeering activity in violation of 18 U.S.C. § 1952. Id. ¶ 10(j).

11. Interference with commerce by threats and violence in violation of 18 U.S.C. § 1951. Id. ¶ 10(k).

12. Making and financing extortionate extensions of credit in violation of 18 U.S.C. §§ 892 and 893. Id. ¶ 10(l).

13. Collection of extensions of credit by extortionate means in violation of 18 U.S.C. § 894. Id. ¶ 10(m).

14. Interstate transportation of stolen property in violation of 18 U.S.C. §§ 2314 and 2315. Id. ¶ 10(n).

15. Thefts from interstate shipments in violation of 18 U.S.C. § 659. Id. ¶ 10(o).

16. Conspiracy to possess and possession with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841. Id. ¶ 10(p).

Defendant participated in the "diverse criminal activity perpetrated by the crew" including: armed robberies of individuals and commercial businesses and armed home invasion; organized theft from the United States mail of credit cards and credit card customer information; unlawful purchase of goods with stolen and altered credit cards; theft of automobiles and automobile parts; dismantling of stolen automobiles; transportation and sale of stolen automobile parts; possession of false vehicle identification numbers; insurance fraud; and distribution of marijuana in New York, Pennsylvania and elsewhere obtained from another co-conspirator, Peter Zuccaro. Id. ¶ 12. The SDFL Indictment further stated that the members of the Young Guns crew affiliated themselves with the Gambino Crime Family in order to facilitate their criminal activities and enhance their reputation and status, and that they sometimes participated in criminal activity on behalf of soldiers of the Gambino Crime Family. Id. ¶ 14.

Defendant pled guilty on December 16, 2004. See generally SDFL Plea Agreement; Tr. of Plea & Sentencing (hereinafter "Plea Tr."), Ex. 1 to Gov't's Opp'n. The SDFL Plea Agreement stated that "the pertinent acts of racketeering activity that the defendant committed or agreed would be committed by other members of the criminal crew in the conduct of the affairs of the [e]nterprise were kidnaping [sic] and bank robbery." SDFL Plea Agreement ¶ 10. At Defendant's plea allocution, the Government proffered the following facts regarding Defendant's charge:

> Had this case proceeded to trial as to Defendant Bruno the Government would
> have proven that the Defendant participated in criminal activities with a group of
> individuals associated in fact as a criminal enterprise . . . . The criminal enterprise
> was initially comprised of a loosely defined group of young criminals who began
> committing crimes in or about the late 1980s. The criminal enterprise rapidly
> assumed a hierarchal structure [] maintained [] separate from its criminal activity.
> The enterprise members referred to themselves a[s] "The Young Guns" and
> affiliated themselves with other persons involved in criminal conduct. The
> enterprise members, including Defendant Bruno, committed armed robberies in
> the New York City area.

The defendant participated in at least five armed bank robberies in the New York area along with two other enterprise members. The co-conspirators used the same pattern during the bank robberies. Defendant Bruno and another enterprise member waited outside the bank in a stolen automobile. The third enterprise member entered the bank and engaged a bank employee in conversation. This enterprise member then displayed a firearm and demanded cash from the bank employee.

After receiving the cash, the enterprise member fled the bank and was driven away by Defendant Bruno or the other enterprise member.

Plea Tr. at 15-16. After detailing the five armed robberies in which Defendant Bruno participated, the Government described additional criminal conduct associated with Defendant:

The defendant also participated in an armed robbery and kidnapping that occurred on February 25, 1994. The defendant and two other enterprise members kidnapped a victim and transported him to a location where he was physically restrained. The victim was involved with the criminal enterprise in chop shop activities, that is, the dismantling of stolen automobiles.

The enterprise members believed that the victim had stolen auto parts from them. The victim was physically beaten and then shot in the leg. The victim was forced to provide approximately $50,000 in jewelry to the enterprise members.

Id. at 17-18. During his plea hearing, Defendant agreed with these facts as the basis for the racketeering conspiracy charge. Id. at 18 (When the court asked Defendant whether Defendant agreed with the facts the Government outlined as the basis for the charge against him, Defendant responded, "[y]es I do, your Honor.").

**II.     Defendant's Motion For A Bill Of Particulars Is Denied**

Defendant first moves for a bill of particulars for Counts One through Five and Ten

through Fifteen pursuant to Federal Rule of Criminal Procedure 7(f).[2]  Def.'s Mot. at 6-9.  The

Government opposes as discussed below. Gov't's Opp'n at 7-13.

The purpose of a bill of particulars "is to inform a defendant of charges with sufficient

precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double

jeopardy." U.S. v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991) (citing Wong Tai v. U.S.,

273 U.S. 77, 82 (1927)); see United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)

(indicating that a "bill of particulars should be required only where the charges of the indictment

are so general that they do not advise the defendant of the specific acts of which he is accused")

(internal citation & quotation marks omitted), abrogated on other grounds by United States v.

Marcus, 628 F.3d 36 (2d Cir. 2010).  "Moreover, the burden is on the defendant to show that

---

[2] Confusingly, Defendant's submissions are inconsistent as to which Counts of the EDNY
Indictment he seeks a bill of particulars.  Defendant's Notice of Motion indicates that he seeks a
bill of particulars "with respect to Racketeering Act Three of count one of the indictment
(distribution of Valium)."  Def.'s Notice of Mot. at 1.  Then, in his Memorandum of Law,
Defendant requests that the Court order a bill of particulars for "Counts One through Five."
Def.'s Mot. at 6.  Finally, in the paragraph concluding his request, Defendant requests a bill of
particulars "concerning each of the drug trafficking and obstruction of justice related counts in
the indictment," which would implicate Counts One through Four (drug trafficking) and Ten
through Fifteen (obstruction). Id. at 9.  Recognizing these discrepancies, the Government
responded "to the broadest formulation of Bruno's motion." Gov't's Opp'n at 7 n.5.  Likewise,
the Court construes Defendant's motion as a motion for a bill of particulars relating to Counts
One through Five and Ten through Fifteen.

As an additional threshold matter, Rule 7(f) provides that "a defendant may move for a
bill of particulars before or within 14 days after arraignment or at a later time if the court
permits." Fed. R. Crim. P. 7(f).  Defendant was arraigned on November 14, 2014, and he filed
the instant motion on August 12, 2015. See 11/14/2014 Minute Entry, ECF No. 9.  Defendant
argues that making an earlier motion for a bill of particulars would have unnecessarily wasted
the Court's time as he was waiting to review the government's discovery materials before
determining whether this motion was necessary. Def.'s Mot. at 6 n.1.  Because the Government
does not oppose the motion as time-barred, the Court permits it.

non-disclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights." United States v. Maneti, 781 F. Supp. 169, 186 (W.D.N.Y. 1991) (citing Torres, 901 F.2d at 234). Finally, "[w]hether to grant a bill of particulars rests within the sound discretion of the district court." Torres, 901 F.2d at 234 (internal citation & quotation marks omitted).

In each of the relevant Counts, the EDNY Indictment outlines a timeline range, specifies the violation of law with which Defendant is charged, and identifies the location of the offense as "the Eastern District of New York and elsewhere." EDNY Indictment ¶¶ 16-48, 55-60. Defendant seeks to supplement this information via "an Order directing the Government to provide the actions of [Defendant] concerning each of the drug trafficking and obstruction of justice related counts in the [I]ndictment, including the date, location, and nature of any overt act he committed in connection with those crimes." Def.'s Mot. at 9.

To support this request, Defendant cites United States v. Ramirez, 602 F. Supp. 783, 793 (S.D.N.Y. 1985), wherein the court granted a defendant's request for a bill of particulars and ordered the Government to provide relevant dates, times, locations, names of co-conspirators and documentation about alleged meetings conducted to further the alleged conspiracy. In Ramirez, "[n]one of the overt act allegations mention[ed the defendant]," who was one of ten co-conspirators charged. Ramirez, 602 F. Supp. at 793. Furthermore, taped conversations involving the defendant "provide[d] no illumination." Id. Thus, the court concluded that there was "not enough information for [the defendant] to prepare an adequate defense" on the eve of trial. Id.

Defendant also leans heavily on the ruling in United States v. Davidoff, 845 F.2d 1151, 1154-55 (2d Cir. 1988), wherein the appellate court reversed a district court's denial of a motion

for a bill of particulars.  In <u>Davidoff</u>, the indictment alleged a conspiracy to extort a particular air freight company with the caveat that the allegation "included, but [was] not limited to" that particular company.  <u>Davidoff</u>, 845 F.2d at 1153.  Defendant unsuccessfully moved for a bill of particulars seeking clarity as to which other companies may be implicated.  <u>Id.</u>  At trial and over objection, the court admitted evidence of extortions committed against three air freight companies other than the one named in the indictment.  <u>Id.</u>  On appeal, the Second Circuit found this to constitute exactly the unfair surprise that bills of particular are intended to prevent, such that it was "simply unrealistic to think that a defendant preparing to meet charges of extorting funds from one company had a fair opportunity to defend against allegations of extortions against unrelated companies, allegations not made prior to trial."  <u>Id.</u> at 1154.

The Government opposes Defendant's motion arguing that the "lengthy 'speaking' Indictment in this case adequately informs the defendant of the nature of the charged offenses and the periods within which the crimes occurred."  Gov't's Opp'n at 11.  The Government also highlights that one of the purposes of a bill of particulars is to give the defendant sufficient information to assert a double jeopardy claim when applicable, which Defendant has been able to assert without the bill of particulars.  <u>Id.</u>; <u>see</u> <u>GAF Corp.</u>, 928 F.2d at 1260.  The Government submits that in addition to the indictment, its February 26, 2015 opposition to Defendant's motion for pretrial release; its August 12, 2015 motion to admit certain consensually recorded statements; and its opposition to this omnibus motion provided Defendant with sufficiently detailed information about the charges against him and the Government's theory.  Gov't's Opp'n at 12.  The Government also cites cases supporting its position that a bill of particulars is not meant to be an investigative tool or a pretrial discovery device.  <u>Id.</u> at 9; <u>United States v. Urso</u>, 369 F. Supp. 2d 254, 272 (E.D.N.Y. 2005) (a defendant is simply "not entitled to receive details

of the Government's conspiracy allegations in a bill of particulars") (citing United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987)), aff'd mem., 875 F.2d 857 (2d Cir. 1989), United States v. Muyet, 945 F. Supp. 586, 599 (S.D.N.Y. 1996) (holding that "defendants are not entitled to a bill of particulars setting forth the 'whens,' 'wheres,' and 'with whoms' regarding the . . . [alleged] enterprise and conspiracy") (collecting cases).

The Court finds Defendant's arguments unpersuasive as to the bill of particulars request. Although Defendant relies on Ramirez, discussed above, the facts of the instant case are more akin to those in United States v. Velez, No. 10 Crim. 147 (JBA), 2010 WL 4929266 (D. Conn. 2010). In Ramirez, the court granted a request for a bill of particulars where the defendant was unaware, on the eve of trial, of the date, time and locations of his alleged involvement in the conspiracy and the names of his co-conspirators. In contrast, in Velez, the court denied a defendant's motion for a bill of particulars upon noting that "[t]he time-period of the conspiracy and the names of eighteen co-conspirators, in combination with the detail provided by the Government from the wiretaps, surveillance, and related documents, [gave] sufficient notice to [the defendant] . . . of the conspiracy with which [he was] charged." Velez, 2010 WL 4929266, at *4. Here, as in Velez, the charges listed in the EDNY Indictment, the various time-period ranges thereof, and the recorded conversations provided to Defendant (and which the Government has stated it will continue to supplement) demonstrate that Defendant has sufficient information about the charges he faces to prepare a defense.[3] See generally EDNY Indictment; Order Granting Mot. in Limine to Admit Consensually Recorded Statements, ECF No. 66. With

---

[3] The Court is permitted to look beyond the EDNY Indictment and consider materials provided to Defendant in discovery. See United States v. Barnes, 158 F.3d 662, 665-66 (2d Cir. 1998) (holding that although an indictment "provided not a shred of detail," the government nonetheless fulfilled its obligation via other materials provided to Defendant).

respect to the racketeering conspiracy and racketeering charges, the EDNY Indictment provides Defendant with the name of the enterprise; a description of the purposes, means and methods of the enterprise; the area in which the enterprise operated; and the approximate duration of the enterprise. See Muyet, 945 F. Supp. at 599. Additionally, the Court agrees with the Government that it provided detailed information to Defendant about the charges against him in its February 26, 2015 opposition to Defendant's motion for pretrial release. Finally, as in Velez and unlike in Ramirez, Defendant has been provided with the names of alleged co-conspirators in the Government's August 12, 2015 Motion in Limine and in its opposition to this omnibus motion. See generally Gov't Mot. in Limine, ECF No. 54.

The Court finds Defendant's reliance on Davidoff unavailing. In his argument, Defendant mistakes the holding in Davidoff as grounded in the length of the alleged conspiracy, rather than in the unfair-surprise element. Def.'s Mot. at 7-8. Defendant has not identified, and the Court has not found, any risk of unfair surprise similar to the one in Davidoff. Moreover, as the Government points out, Defendant has not and could not compellingly argue that he is entitled to a bill of particulars for the sake of interposing a double-jeopardy claim because Defendant submits such a claim in this omnibus motion. Gov't's Opp'n at 11; Def.'s Mot. at 12-20. Thus, Defendant has not been prejudiced by a lack of sufficient information regarding the charges against him. In conclusion, the record established thus far demonstrates that the Government fulfilled its obligation to give Defendant notice of the charges he faces. The Court respectfully recommends that the District Judge deny Defendant's motion for a bill of particulars.

III.     **The Racketeering Charge In Count One Is Not Barred By Double Jeopardy**

Defendant next moves to dismiss Count One as barred by the Double Jeopardy Clause of

the Fifth Amendment to the United States Constitution.  <u>See</u> <u>generally</u> Def.'s Mot. at 12-20.  The

Government opposes.  <u>See</u> <u>generally</u> Gov't's Opp'n at 13-51.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution

states that no person shall "be subject for the same offense to be twice put in jeopardy of life or

limb," U.S. Const. amend. V, meaning it "protects against both multiple punishments and

successive prosecutions for the same offense," <u>United States v. Basciano</u>, 599 F.3d 184, 196 (2d

Cir. 2010) (citing <u>Schiro v. Farley</u>, 510 U.S. 222, 229 (1994)).  Defendant argues that Count One

of the EDNY Indictment is barred by double jeopardy because it charges Defendant with

racketeering conspiracy under Title 18, United States Code, Section 1962(d), the same charge to

which Defendant already pled guilty under the SDFL Indictment.  Def.'s Mot. at 12.  The

Court's "review is guided by a burden-shifting framework that requires the defendant, in the first

instance, to make a colorable showing that the crimes are the same, whereupon the government

is required to demonstrate 'by a preponderance of the evidence' that a person 'familiar with the

totality of the facts and circumstances would <u>not</u>, in fact, construe the initial indictment, at the

time jeopardy attached, to cover the offense that was charged in the subsequent prosecution.'"

<u>Basciano</u>, 599 F.3d at 197 (citing <u>United States v. Olmeda</u>, 461 F.3d 271, 283 (2d Cir. 2006))

(emphasis in original).

Title 18, United States Code 1962(c) (of the Racketeer Influenced and Corrupt

Organizations or "RICO" statute) states that:

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, to
> conduct or participate, directly or indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  To prove a racketeering conspiracy charge, the Government must show

both the existence of an "enterprise" and a "pattern of racketeering activity."  <u>See</u> <u>United States</u>

v. Russotti, 717 F.2d 27, 33 (2d Cir. 1983) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). "[I]t is neither the enterprise standing alone nor the pattern of racketeering activity by itself which [the RICO statute] criminalizes. Rather, the combination of these two elements is the object of punishment under RICO." Id. at 33 (emphasis in original). Therefore, "to give rise to a valid claim of double jeopardy, both the enterprise and the pattern of activity alleged in the [first] indictment must be the same as those alleged in the [second] indictment. If either is different, there is no infirmity under the [D]ouble [J]eopardy [C]lause." Id. (emphasis in original).

As to the first element, when considering whether the enterprises are distinct, the Second Circuit's decision in United States v. Langella, 804 F.2d 185 (2d Cir. 1986), offers guidance. In Langella, the Second Circuit found two distinct enterprises where the first indictment charged the enterprise as the "Colombo Family of La Cosa Nostra" and the second indictment charged the enterprise as the "Commission of La Cosa Nostra." Langella, 804 F.2d. at 189. In finding separate enterprises, the Second Circuit held that, although the enterprises in the two indictments were "vertically organized segments of an intricate, organized crime structure, the allegations of the two indictments sufficiently demonstrate[d] that they [were] two separate and independent criminal enterprises. Significantly, the Colombo Family is not merely a lower level of authority within the hierarchy of organized crime[, but is] . . . a self-sufficient enterprise that functions without oversight." Id. (emphasis added). An oft-cited First Circuit decision, United States v. Connolly, 341 F.3d 16 (1st Cir. 2003), found distinct enterprises even where there was both overlap in membership and the criminal activities of the enterprises. Connolly, 341 F.3d at 28; see United States v. Boyle, 2010 WL 4457240, at *3 (S.D.N.Y. Oct. 27, 2010), aff'd, 452 F. App'x 55 (2d Cir. 2011) (citing Connolly).

For the second element, the Second Circuit in <u>Russotti</u>, 717 F.2d at 33, adopted a multi-factor test to help courts determine whether successive racketeering counts charge distinct patterns of racketeering:

> (1) the time of the various activities charged as parts of separate patterns; (2) the identity of the persons involved in the activities under each charge; (3) the statutory offenses charged as racketeering activities in each charge; (4) the nature and scope of the activity the government seeks to punish under each charge; and (5) the places where the corrupt activity took place under each charge.

<u>Russotti</u>, 717 F.2d at 33 (citing <u>United States v. Dean</u>, 647 F.2d 779 (8th Cir.1981)). Courts must look at the "totality of the circumstances" when reviewing these factors, keeping in mind that the fourth factor is the most important, then determine whether a "reasonable person would think it 'more likely than not' that the two patterns of racketeering at issue are, in fact, distinct." <u>Basciano</u>, 599 F.3d at 200-02, 211 (citing <u>United States v. Pizzonia</u>, 577 F.3d 455, 464 (2d Cir. 2009) (observing that the Second Circuit's "sister circuits have adopted similar holistic approaches"), & <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 329 (2007)); <u>see</u> <u>Russotti</u>, 717 F.2d at 34. Additionally, courts must be careful not to identify the charged pattern by reference only to predicates attributed to a particular defendant, as that "risks the identification of multiple patterns of racketeering rather than the common pattern alleged by the grand jury." <u>Basciano</u>, 599 F.3d at 206. "[I]t is the pattern of activity, not the predicates, that is punished by a racketeering conviction." <u>Id.</u> at 205.

### A.     Defendant's Argument

Defendant argues that the racketeering charge in Count One is based on the same enterprise and pattern of racketeering that was charged in the SDFL Indictment. Def.'s Mot. at 13. First, Defendant argues that the enterprise alleged in the SDFL Indictment is distinct in name only from the enterprise alleged in the EDNY Indictment. <u>Id.</u> To support this contention, he

maintains that the language in both indictments states that the enterprises – the "Young Guns a/k/a Liberty Posse" in the SDFL Indictment and the "Corozzo Faction of the Gambino Crime Family" in the EDNY Indictment – operated under the control of the Gambino Crime Family. Id. In his reply, Defendant stresses that the SDFL Indictment states in several places that the SDFL enterprise operated under the control and authority of the Gambino Crime Family. Def.'s Reply at 6-7, ECF No. 65; SDFL Indictment ¶¶ 8, 12(a), 14(b). Defendant additionally charges that the EDNY Indictment's description of the Young Guns as functioning "self-sufficiently and without oversight" from the Gambino Crime Family is an "attempt to evade the strictures of the Double Jeopardy Clause." Def.'s Mot. at 13;[4] EDNY Indictment ¶ 8. Endeavoring to distinguish the present case from Langella, he points out that neither the SDFL Indictment's description of the Young Guns nor the EDNY Indictment's description of the Corozzo Faction describes the enterprises as "self-sufficient" and operating "without oversight" from the Gambino Crime Family. Def.'s Mot. at 15.

Next, Defendant argues that the patterns of racketeering in both indictments are the same under the Russotti factors. Id. at 16. First, Defendant highlights the approximate five-year overlap in criminal activities by both enterprises, from 2000 to July 2004. Id. The murder of Martin Bosshart, the extortionate activity, the remainder of the racketeering acts, and the remainder of the racketeering acts charged in the EDNY Indictment (except for the charges related to witness tampering (racketeering act six)) all allegedly occurred during that five-year

_____

[4] Defendant also categorizes the EDNY enterprise as a faction of the Gambino Crime Family, led by Ronald Trucchio under the direction of Joseph Corozzo. Def.'s Mot. at 13-14. Defendant asserts that the Ronald Trucchio crew alleged in the SDFL Indictment and the Trucchio part of the Corozzo Faction alleged in the EDNY Indictment were the same thing. Id. At oral argument, Defendant admitted that this was an incorrect reading of the EDNY Indictment. See 10/22/2015 Tr. at 35-36; EDNY Indictment ¶ 9.

time period.  Id.  Second, Defendant suggests that from the description of the crews described in the indictments, it can be determined that most of the members of the "Young Guns" or "Liberty Posse" crew were the same, although Defendant does not name specific overlapping members. Id. at 17.  Third, Defendant contends that the statutory offenses plainly cut in favor of finding a similar pattern of racketeering, as several of the same offenses are charged in both indictments, including: murder in violation of N.Y.P.L. § 125.00; extortion and conspiracy to commit extortion in violation of N.Y.P.L. § 155; witness tampering in violation of 18 U.S.C. § 1512; and 21 U.S.C. §§ 841 and 846.  Id.  Fourth, Defendant encourages the Court to rely on Basciano and to determine that, like the pattern of racketeering at issue in Basciano, the SDFL Indictment describes a broad pattern of racketeering that covers the activities in each indictment.  Id. at 19-20; Def.'s Reply at 10-11.  Fifth, Defendant avers that the locations of the alleged crimes are the same, as both indictments state that the crew's activities were based in New York City.  Def.'s Mot. at 20; Def.'s Reply at 15.

### B.  Government's Argument

The Government disagrees that the alleged enterprises and the patterns of activity are the same.  The Government first argues that the SDFL enterprise is the "Young Guns" and that the SDFL Indictment does not allege that the Young Guns were part of the formal hierarchy and structure of the Gambino Crime Family.  Gov't's Opp'n at 32.  Instead, relying heavily on the EDNY Indictment throughout its argument, the Government characterizes the Young Guns as a loosely organized group of young men who were akin to a "farm team" doing work for various crime families, not only the Gambino Crime Family.  Id. at 33-34, 37.  The Corozzo Faction, on the other hand, was part of the hierarchy of the Gambino Crime Family according to the Government.  Id.  Additionally, the Government claims that the Young Guns did not exist

beyond the 1980s and 90s, while the Corozzo Faction was highly structured and continued for more than thirty years.  Id. at 37.  Furthermore, the Government maintains that Defendant reported to different people under each enterprise – Ronald Trucchio when he was in the Young Guns and Louis Mastrangelo when he was in the Corozzo Faction.  Id. at 34.  Although the Government does not admit to any overlap in membership of the enterprises, it argues that to the extent there is any overlap, it does not suggest that the enterprises are the same.  Id.

Next, the Government contends that the patterns of racketeering are different and encourages the Court to look at the transcript of Defendant's plea allocution in the SDFL to determine the scope and nature of the conspiracy and Defendant's involvement in it.  See id. at 42-43, 47.  The Court is permitted to look at the plea allocution in making its determinations. See Olmeda, 461 F.3d at 282-83 (permitting the Court to rely on the entire record of a defendant's previous proceedings in its double jeopardy examination).

Looking at the same Russotti factors, the Government first points out that three of the six predicate acts in the EDNY Indictment occurred in 2009-2011, well after the July 2004 end date of the racketeering conspiracy charged in the SDFL Indictment.  Id. at 42-43.  The Government also reasons that although the SDFL Indictment did not attribute specific predicate acts to Defendant, the specific acts described by the Government and accepted by Defendant at Defendant's plea allocution – armed robbery of five banks and armed robbery and kidnapping – occurred in 1993 and 1994.  Id.  Defendant's SDFL plea allocution also described a shift in the focus of the SDFL enterprise's activities from New York to South Florida in 1994, even though the specific acts to which Bruno pled occurred in New York.  Id.  The Government stresses that there are no allegations in the EDNY Indictment that any of the racketeering conspiracy acts took place in Florida.  Instead, the racketeering activity in the EDNY Indictment took place in

New York City, Canada, Pennsylvania and Virginia.  Id.  at 44.  In looking to the second

Russotti factor, the Government reasserts that there was very little overlap in the memberships of

the enterprises, with the exception of one person, Robert Bucholz, who was involved in

racketeering act six of the EDNY Indictment.  Id. at 45.  According to the Government, the two

co-conspirators in the EDNY case, Todd LaBarca and Michael Roccaforte, were never Young

Guns.  Id.

Last, the Government argues that the statutory offenses and the nature and scope of the

racketeering activities are different.  Id. at 46.  The Government encourages the Court to focus

on the specific racketeering acts attributed to Defendant at his plea allocution in the SDFL –

armed robbery and kidnapping – which are not alleged in the EDNY Indictment.  Id. at 47.  The

Government discusses how the EDNY Indictment charges violations of different drug-trafficking

statutes, as the drug trafficking in the EDNY Indictment is alleged to have included importation

of marijuana from Canada.  Id.  The EDNY Indictment, while charging a violation of the same

New York criminal murder statute as in the SDFL Indictment, also charges a different murder –

the murder of Martin Bosshart – that is not alleged in the SDFL Indictment.  Id. at 48.  As to the

nature and scope of activity, the Government argues that the activity in the SDFL Indictment was

directed at Defendant's affiliation with the Young Guns, while the EDNY Indictment focuses on

Defendant's conduct as a Gambino Associate in the Corozzo Faction of the Gambino Crime

Family.  Id. at 48-49.

> **C.**     **The Court's Analysis**

"In the case of successive prosecutions, the critical inquiry is whether the offenses are the

same in fact and in law."  Basciano, 599 F.3d at 196 (internal citations omitted).  As discussed

above, the conspiracy count that Defendant pled guilty to in the SDFL Indictment is the same in

law as Count One in the EDNY Indictment. "Thus the critical question . . . is whether the pattern element charged in the [EDNY Indictment] is factually distinct from that at issue in the [SDFL Indictment]." Id. at 200. Additionally, the Court finds that Defendant has made a colorable showing that the crimes are the same, thus shifting the burden to the Government to show that "a reasonable person would think it more likely than not" that the two racketeering conspiracies are in fact, different. Basciano, 599 F.3d at 202.

As to the enterprise prong, the two indictments describe enterprises involving the Gambino Crime Family. SDFL Indictment ¶ 8; EDNY Indictment ¶ 1. As to the patterns of racketeering activity prong, the methods and means by which each enterprises' affairs were conducted also suggest similar patterns of racketeering activity. Both indictments charge that the enterprises' affairs were conducted through patterns of racketeering activity that included the common acts of murder, drug trafficking, robbery and extortion. SDFL Indictment ¶ 14; EDNY Indictment ¶ 11. Thus, the Court finds that Defendant has made a colorable showing that the crimes are the same, and the Court will analyze whether the Government has shown by a preponderance of evidence that the crimes are, in fact, different.

As explained below, the Court finds that the enterprises charged in the two indictments are the same, but that a reasonable person would find it more likely than not that the patterns of racketeering activity are different. Therefore, Count One is not barred by double jeopardy.

### 1. The Same Enterprise

As to the enterprise prong, both the SDFL Indictment and EDNY Indictment define the enterprises charged in each as operating under the control of and as part of the Gambino Crime Family. Specifically, the SDFL Indictment states that "'the crew' operating under the control of the Gambino Organized Crime Family constituted an '[e]nterprise.'" SDFL Indictment ¶ 8

(emphasis added). The EDNY Indictment similarly states that "the Corozzo Faction <u>within</u> the Gambino organized crime family of La Cosa Nostra constituted an 'enterprise.'" EDNY Indictment ¶ 1 (emphasis added). As Defendant argues, and the Court agrees, the enterprise in each is an integrated part of the Gambino Crime Family.

The Court is persuaded that this case is distinguishable from <u>Langella</u>. In <u>Langella</u>, the Second Circuit found that the first indictment adequately demonstrated that the Colombo Family was a self-sufficient enterprise that operated without oversight from the Commission, which was the enterprise charged in the second indictment. The opposite is true here, where both indictments explicitly state that each crew operated under the authority and control of the Gambino Crime Family and defines the enterprise in those terms. SDFL Indictment ¶ 8; EDNY Indictment ¶ 1. Although the EDNY Indictment describes the "Young Guns" as separate and self-sufficient from the Gambino Crime Family, and while that may actually be how the organization operated, the EDNY Indictment's description of the SDFL enterprise is not controlling. EDNY Indictment ¶ 8. The Court must rely instead on the language in the SDFL Indictment, which clearly states that the enterprise operated under the control of the Gambino Crime Family. SDFL Indictment ¶ 8.

Even though two district courts in this Circuit in other cases have found that a "crew" was not part of the structure of the overarching organized crime family, the cases are distinguishable from the present actions. The Government relies on <u>United States v. Boyle</u>, No. 08 Crim. 523 (CM), 2010 WL 4457240, at *3 (S.D.N.Y. Oct. 27, 2010), <u>aff'd</u>, 452 F. App'x 55 (2d Cir. 2011), in which the court found that the "Boyle crew" was a distinct enterprise from the Gambino organized crime family. Yet, in <u>Boyle</u>, the language in the indictment clearly described the crew as separate and distinct from the organized crime family, which is simply not

the language used in the SDFL Indictment.  See Boyle, 2010 WL 4457240, at *3 (holding that

the "Boyle crew" was a distinct enterprise from the Gambino Crime Family); c.f. United States

v. Urso, 369 F. Supp. 2d 254, 262 (E.D.N.Y. 2005) (finding that the defendant agreed the

"Ridgewood Boys" were a distinct enterprise from the Bonano Crime Family, but the court may

have found differently if the defendant had actually argued they were both part of the Bonano

Crime Family).  For these reasons, the Court finds that the enterprise in both indictments is the

same.

### 2.  Different Patterns Of Racketeering

Nevertheless, the Double Jeopardy Clause does not apply to Count One because each

indictment alleges a distinct pattern of racketeering activity.  Addressing the first Russotti factor,

the time of the various activities charged as part of the separate patterns, there is at most only a

four-and-a-half-year overlap in the time periods alleged in the indictments, 2000 to 2004.[5]  Only

three of the six racketeering activities alleged in the EDNY Indictment occurred during that

overlapping time period.  All of the other activities occurred outside the time period alleged in

the SDFL Indictment, and additionally, the Government, at Defendant's plea allocution,

contended that the enterprise's activities took place from 1993-1995.  Moving to the second

Russotti factor,[6] the identity of the persons involved in the activities under each charge, there is

no overlap as the persons involved in the racketeering activities in each indictment are different,

---

[5] To be clear, the SDFL Indictment does not allege specific time periods for the individual
racketeering acts as the EDNY Indictment does, so the Court looks to the broadest time-period
alleged in the SDFL Indictment in its analysis.  SDFL Indictment ¶ 9.  Yet, the Court notes that
at the plea allocution, the Government contended that the enterprise's activities took place in
1993 – 1995.  Plea. Tr. at 15-18.  This weighs heavily in favor of finding that there is no
significant overlap in the time periods of the patterns of activity.

[6] The Court looks not to whether the same persons were actually charged in the two indictments,
but "rather whether the same persons were involved in the activities charged."  Basciano, 599
F.3d at 208.

except for Robert Bucholz. Defendant is charged alone in the EDNY Indictment, and the only other person mentioned in the indictment is Joseph Corozzo, to whom Defendant reported as a member of the Corozzo Faction. In its papers and at oral argument, the Government alleges that Defendant conspired with Todd LaBarca and Michael Roccaforte in committing racketeering activity four, the murder of Martin Bosshart. <u>See</u> Southern District of New York Indictment dated 01/05/2011 attached as Exhibit E to Def.'s Mot. ¶ 22. Neither Todd Labarco nor Michael Roccaforte was alleged to have been involved in the activities charged in the SDFL Indictment, and the overlap of one person between the two multi-member enterprises is not significant.

As to the third <u>Russotti</u> factor, there is overlap in the statutes charged as racketeering activities between the indictments, yet it is clear from the indictments that although some of the statutes under which the charges were brought are the same, the basic underlying criminal activities alleged under the statutes are different. A discussion of the underlying activities touches on the fourth <u>Russotti</u> factor, the nature and scope of the activity that the Government seeks to punish under each charge. Therefore, the Court will address both factors together, reviewing each of the activities in the EDNY Indictment to evaluate whether it was previously charged as a racketeering activity in the SDFL Indictment, but the Court is careful not to look solely at the predicate acts involving Defendant, as <u>Basciano</u>, 599 F.3d at 205-206, specifically advises the Court against doing so in its analysis:

1. Conspiracy to import marijuana and importation of marijuana, in or about and between 2000 and 2010 within the Eastern District of New York and elsewhere in violation of Title 21, United States Code, Sections 952(a), 960(a)(1), 960(b)(1)(G) and 963 is <u>not</u> charged in the SDFL Indictment. The Government also argues in their papers that the marijuana was imported from Canada, while the marijuana in the SDFL indictment was locally grown. Gov't's Opp'n at 47. Regardless, this statute was not charged in the SDFL Indictment.

2. Conspiracy to distribute marijuana and distribution of marijuana, in or about and between 2000 and 2011 within the Eastern District of New York and elsewhere in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(vii) and

846 is charged in the SDFL Indictment.  <u>See</u> SDFL Indictment ¶ 10(p).  Yet, the marijuana conspiracy in the EDNY Indictment is alleged to have continued beyond 2004 and after the time period of the racketeering conspiracy alleged in the SDFL Indictment.

3.  The third racketeering activity, conspiracy to distribute and distribution of valium, in or about and between 2000 and 2003 within the Eastern District of New York and elsewhere in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(2) and 846 is <u>not</u> charged in the SDFL Indictment.  Although this statute was charged in the SDFL Indictment, it was charged in relation to the distribution of marijuana.  <u>See</u> SDFL Indictment ¶¶ 12(d), 14(i).  Valium is not mentioned in the SDFL Indictment, thus the Court concludes that this statute was meant to apply solely to the distribution of marijuana in the SDFL Indictment.[7]

4.  Conspiracy to murder and murder of Martin Bosshart on or about January 2, 2002, in the Eastern District of New York and elsewhere in violation of New York Penal Law Sections 125.25(1), 105.15 and 20.00 is <u>not</u> charged in the SDFL Indictment.  Although the SDFL Indictment charged murder and conspiracy to commit murder in violation of the same New York Penal Law sections, it was in relation to the murders of Vincent D'Angola and Jamie Schneider, not Martin Bosshart.  <u>See</u> SDFL Indictment ¶ 10(a) and at 16.

5.  Both conspiracy to commit Hobbs Act Extortion of the proceeds from a waste-carting company in Queens, New York in or about and between 2000 and 2003 within the Eastern District of New York and elsewhere in violation of Title 18, United States Code, Sections 1951(a), and State Law Extortion and Attempted State Law Extortion in or about and between 2000 and 2003 within the Eastern District of New York and elsewhere in violation of New York Penal Law Sections 155.40(2), 155.05(2)(e)(i), 155.05(2)(e)(ii), are charged in the SDFL Indictment, <u>see</u> SDFL Indictment ¶¶ 10(d), 10(k), but are <u>not</u> charged in connection with a waste-carting company in Queens, as outlined in the EDNY indictment.  Extortion of a waste-carting company in Queens is not described in the SDFL Indictment.  Although not entirely clear in the SDFL Indictment, it appears to allege these activities in connection with armed robberies.  SDFL Indictment ¶¶ 13, 14(e), 14(l).

6.  The EDNY Indictment specifically charges conspiracy to prevent the testimony of John Doe #2 in an official proceeding in or about and between 2009 and October 2014 within the Eastern District of New York in violation of Title 18, United States Code, Sections 1512(b)(1) and 1512(k); conspiracy to prevent communication to a law enforcement officer in or about and between 2009 and October 2014 within the Eastern District of New York in violation of Title 18, United States Code, Sections 1512(b)(3) and 1512(k); and conspiracy to obstruct an official proceeding in or about

---

[7] The Court notes that while the EDNY Indictment charged as racketeering activities subsections of Title 21, United States Code, Sections 841 and 846, the SDFL Indictment does not charge subsections.

and between 2009 and October 2014 within the Eastern District of New York in violation of Title 18, United States Code, Section 1512(c)(2), while the SDFL Indictment generally charges a violation of Title 18, United States Code, Section 1512. SDFL Indictment ¶ 10(g). The language in the SDFL Indictment conveys that it was covering similar behavior in the EDNY Indictment, including conspiring to prevent cooperation with law enforcement, intimidate and threaten witnesses, and attempt to locate and murder Government witnesses and the Assistant United States Attorneys assigned to the case. SDFL Indictment ¶¶ 14(q), 14(t), 14(u). The EDNY Indictment charges that these acts occurred from 2009 to 2014, five years after the time period alleged in the SDFL racketeering conspiracy.

In summary, although four of the six statutes charged in the EDNY Indictment were also charged in the SDFL Indictment, it is clear from the respective indictments that, other than the marijuana conspiracy in EDNY racketeering act two, the nature and scope of the underlying activities are different. As to the marijuana conspiracy, there is an overlap of only four years, and the marijuana conspiracy in the EDNY indictment is alleged to have occurred for seven years past the time period covered in the SDFL Indictment. This brings the Court to the fifth Russotti factor, the places where the corrupt activity took place under each charge. There is obviously overlap in the locations of the activities as both indictments allege they took place in Ozone Park, Queens. Yet, the SDFL Indictment also alleges that some of the activities took place in Florida, and Florida is not mentioned in the EDNY Indictment. Having analyzed each of the Russotti factors and now looking at the totality of the circumstances, the Court finds that a reasonable person would find it more likely than not that there are distinct patterns of racketeering activities alleged in each indictment: the overlap in the time periods is not significant; there is little commonality in the persons who participated in the racketeering activities; although some of the same statutes are charged, they are charged in relation to different racketeering activities, which leads the Court to conclude that the nature and scope of the activities are different; and although the location of the activities might be similar, Florida is not a location alleged in the EDNY Indictment.

The Court disagrees with Defendant's contention that the present case is similar to Basciano. In Basciano, the Government put forth a specific theory that the pattern of racketeering in the second indictment was narrower in time and purpose (i.e., that it was targeted at defending the organized crime family from law enforcement after the defendant's arrest) than the one charged in the first indictment, while simultaneously charging a pattern of activity nearly identical to the one charged in the first indictment and also overlapping extensively in time (by eight years) with the first indictment. Indeed, the predicate acts cited as evidence of the pattern of racketeering activity in Basciano's first prosecution occurred within the timeframe of the second indictment's predicate acts. See Basciano, 599 F.3d at 208. Additionally, the Second Circuit noted that at Basciano's trial, "the government offered proof of most of the predicate acts charged against Basciano in the pending substantive racketeering count to 'complete the story' of the substantive racketeering crime of conviction." Id. at 189. The Basciano Court highlighted the incongruousness of the Government's theory – that it was arguing distinct patterns while charging many of the same acts in the subsequent indictment – when determining that the second pattern of racketeering was a mere continuation of the first. Id. at 203-04; 213-14. Also of note is that many of the participants in the two patterns of racketeering overlapped. Id. at 208-209.

This is not the case here. In sum, the pattern of racketeering alleged in the EDNY Indictment is not a mere continuation of the pattern alleged in the SDFL Indictment, but it is an entirely new pattern of activity. The only overlap in the racketeering acts between the two indictments is the marijuana conspiracy charged as racketeering act two in the EDNY Indictment, while the other racketeering acts are different both in their underlying nature and in the scope of the time periods involved. The time periods of the overall activities also only overlap by four-and-a-half-years, and just as to a few of the predicate acts. Furthermore, only

28

one participant is alleged to have been involved in both patterns of racketeering activity.  Thus, the totality of circumstances supports the finding of a distinct pattern.

The Court therefore respectfully recommends that the District Judge find that the patterns of racketeering activities in each indictment are distinct; that the RICO charge in each indictment is different; that the Double Jeopardy Clause is inapplicable to Count One of the EDNY Indictment; and that the District Judge deny Defendant's motion.

**IV.    The 2004 Southern District Of Florida Plea Agreement Does Not Bar The Current Charges**

Defendant next moves to dismiss Counts One through Nine of the EDNY Indictment as covered by the SDFL Plea Agreement and thus barred by the Due Process Clause of the Fifth Amendment to the United States Constitution.  Def.'s Mot. at 20-21.  The Government opposes. See generally Gov't's Opp'n at 52-56.

"The Second Circuit has 'long interpreted plea agreements under principles of contract law . . . but . . .  noted that plea agreements are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain.'"  United States v. Gotti, 457 F. Supp. 2d 411, 424 (S.D.N.Y. 2006) (quoting In re Altro, 180 F.3d 372, 375 (2d Cir. 1999)).  The Second Circuit's "concern for fairness is rooted in an appreciation of the fact that, unlike ordinary contracts, plea agreements call for defendants to waive fundamental constitutional rights, and in an awareness that the Government generally drafts the agreement and enjoys significant advantages in bargaining power."  In re Altro, 180 F.3d at 375.  Therefore, when interpreting a plea agreement, a court should look to the reasonable understanding of the parties as to the terms of the agreement and resolve any ambiguities strictly against the Government.  See Gotti, 457 F. Supp. 2d at 424 (citing United States v. Palladino, 347 F.3d 29, 33 (2d Cir. 2003)); United States v. Ready, 82 F.3d 551, 559 (2d Cir. 1996).  On the other hand,

where "the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement, a defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach."  In re Altro, 180 F.2d at 376; United States v. Brown, No. 99-1230(L), 2002 WL 34244994, at *2 (2d Cir. Apr. 26, 2002) (applying this language from In re Altro to an SDFL plea agreement with an integration clause).

It is well-settled Second Circuit law that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction."  United States v. Annabi, 771 F.2d 670, 672 (2d Cir. 1985).[8]  The mere use of the term "United States" or "'government' in the plea agreement does not create an affirmative appearance that the agreement contemplated barring districts other than the particular district entering into the agreement."  United States v. Salameh, 152 F.3d 88, 120 (2d Cir. 1998) (quoting United States v. Laskow, 688 F. Supp. 851, 853 (E.D.N.Y. 1988)) (internal quotations omitted); United States v. Gonzalez, 93 F. App'x 268, 270 (2d Cir. 2004) (finding the phrase "United States" identical to "government" in plea agreements).

Defendant's argument focuses on two clauses in the plea agreement:

This agreement resolves the defendant's federal criminal liability in the Southern District of Florida growing out of any criminal conduct by the defendant known

---

[8] As noted in United States v. Gebbie, 294 F.3d 540, 547 (3d Cir. 2002), there is no strong legal analysis supporting the evolution of this rule in the Second Circuit.  United States v. Gebbie, 294 F.3d 540, 547 (3d Cir. 2002) ("How the rule 'has evolved' . . . shows that it really has no analytically sound foundation.  It just keeps replicating itself each time it is cited."); United States v. Abbamonte, 759 F.2d 1065, 1072 (2d Cir. 1985) (finding there was "no indication that the plea agreement contemplated any restriction on prosecutions initiated in any district other than the district in which the plea was entered" where the Southern District of New York plea agreement included the following commitment: "The government has agreed that as part of this plea, firstly that this plea will cover all charges that could have come about by the government arising out of these facts.") (citing to United States v. Alessi, 544 F.2d 1139, 1154 (2d Cir. 1976), & United States v. Papa, 533 F.2d 815, 823 (2d Cir. 1976)).

> to the United States Attorney's Office for the Southern District of Florida as of the date of this plea agreement.
>
> This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

SDFL Plea Agreement ¶¶ 17-18. Based on these clauses, Defendant first argues that the plea agreement covers all criminal activity known to the USAO for the SDFL at the time of Defendant's plea. Def.'s Mot. at 24-25. Second, Defendant contends that the USAO for the SDFL acted on behalf of the United States when it executed the plea agreement and, therefore, the plea agreement not only bound the USAO for the SDFL, but the entire federal government. Id. at 25-28. Accordingly, Defendant submits that the USAO for the EDNY is bound by the plea agreement and asks for an evidentiary hearing to determine what charges were known to the USAO for the SDFL when Defendant entered into the plea agreement, so that the Court may determine which of the charges to dismiss. Id. at 28.

In making his argument, Defendant acknowledges that Annabi is binding case law in the Second Circuit, but he argues that the repeated use of the term "United States" makes it clear that the parties intended the agreement to affirmatively contemplate a broader restriction. Def.'s Reply at 17-19. Defendant also identifies a split in the circuit courts on whether, as here, broad language in a plea agreement such as "government" or "United States" binds all USAOs throughout the country and not just the office that entered into the plea agreement. Def.'s Mot. at 27; see Gebbie, 294 F.3d at 550 ("We hold, therefore, that when a United States Attorney negotiates and contracts on behalf of 'the United States' or 'the Government' in a plea agreement for specific crimes, that attorney speaks for and binds all of his or her fellow United States Attorneys with respect to those same crimes and those same defendants."); United States v. Carter, 454 F.2d 426, 428 (4th Cir. 1972) ("The United States government is the United States

government throughout all of the states and districts."); <u>United States v. Van Thournout</u>, 100 F.3d 590, 594 (8th Cir. 1996) ("Absent an express limitation, any promises [regarding a plea agreement] made by an Assistant United States Attorney in one district will bind an Assistant United States Attorney in another district.").

As mentioned above, the Government opposes, relying on the case law set forth in <u>Annabi</u> to argue that the plea agreement only binds the USAO for the SDFL. Gov't's Opp'n at 53-54. The Government also points to the same language in the SDFL Plea Agreement cited by Defendant, arguing that it specifically states it only "resolves the defendant's federal criminal liability in the Southern District of Florida." <u>Id.</u> at 55; SDFL Indictment ¶ 17. Lastly, the Government draws the Court's attention to <u>Brown</u>, 2002 WL 34244994, at *2, in which the Second Circuit found the USAO for the EDNY was not bound by an SDFL plea agreement that seems to have included language similar or identical to the language in this agreement. Gov't's Opp'n at 55.

The Court finds that the USAO for the EDNY is not bound by the plea agreement entered into by the USAO for the SDFL. Addressing Defendant's first argument, the Court does not find that the key phrase in the plea agreement, "any criminal conduct known to the United States Attorney's Office for the Southern District of Florida," by its plains terms, refers to all of Defendant's criminal activity across the United States that was known to the USAO for the SDFL at the time. Therefore, it will not recommend that the Court hold a hearing on the matter.[9] The phrase on which Defendant relies is qualified by the preceding phrase in the same clause,

---

[9] The Court notes that Defendant does not argue that it was his specific understanding that the agreement covered all of his criminal liability, but that the plain terms of the agreement stated as much. Def.'s Mot. at 24-25.

which states "[t]his agreement resolves defendant's federal criminal liability in the Southern

District of Florida . . . ." SDFL Plea Agreement ¶ 17. Thus, the clause, in its entirety and in

unambiguous terms, limited the plea agreement to Defendant's criminal liability in the SDFL.

The only reasonable reading of the plea agreement in its entirety is that it covered Defendant's

liability in the SDFL; it would have been an unreasonable reading of the agreement for

Defendant to have believed that it covered all of his criminal liability across the United States.[10]

Defendant's argument that the use of the phrase "United States" shows that the parties

intended to affirmatively bind other USAOs with the plea agreement is also unavailing. The law

in the Second Circuit is clear that, absent an affirmative appearance that the plea agreement

contemplated barring districts other than the SDFL, a plea agreement entered into by the USAO

for the SDFL does not bind any other district, and that the phrase "United States," as used in the

SDFL Plea Agreement, does not bind the entire federal government. Annabi, 771 F.2d at 672;

Salameh, 152 F.3d at 120; Gonzalez, 93 F. App'x at 270.[11] In an attempt to circumvent Annabi,

---

[10] The SDFL plea agreement also has an integration clause stating that the agreement represents all understandings between Defendant and the USAO for the SDFL. See SDFL Plea Agreement ¶ 18. Although Defendant does not argue that there were other understandings between Defendant and the USAO that were not memorialized in the plea agreement, to the extent that he could, the integration clause would prevent such an argument from gaining any traction. In re Altro, 180 F.2d at 375; Brown, 2002 WL 34244994, at *2.

[11] Although Defendant makes a compelling argument questioning the Second Circuit's requirement of an affirmative statement as to the broad reach of a plea agreement in order to find a plea agreement binding on extra-District Courts, this Court's recommendation does not rely primarily on that line of cases and so the Court does not recommend that the District Court find the Second Circuit's analysis incorrect. Were the SDFL plea agreement differently drafted, a closer analysis would be warranted, but the Court would likely still be bound by the Court of Appeals' decisions. There is no Second Circuit authority for the Court to take Defendant's position; rather, there are multiple decisions from the Second Circuit in which it has applied Second Circuit law in analyzing the reach of plea agreements from other circuits. See, e.g., United States v. Prisco, 391 F. App'x 920, 921 (2d Cir. 2010) (applying Annabi in analyzing a plea agreement entered into in the District of New Jersey); United States v. Ashraf, 320 F. App'x 26, 28 (2d Cir. 2009) (applying Annabi in analyzing a plea agreement entered into in the Eastern

Defendant argues that the Court should interpret the plea agreement according to the laws of the Eleventh Circuit, where it was negotiated. Def.'s Mot. at 26. Given that the plain text of the SDFL plea agreement limits Defendant's liability to the SDFL, an application of Eleventh Circuit law would not result in a different outcome. See United States v. Copeland, 381 F.3d 1101, 1105 (11th Cir. 2004) ("Only where the language of the [plea] agreement is ambiguous, or where government overreaching is alleged does the court consider parol evidence.") (internal citations omitted).

For these reasons, the Court respectfully recommends that the District Judge find that the USAO for the EDNY is not bound by the SDFL plea agreement and deny Defendant's motion.

## V.     The Charges Related To The Murder Of Martin Bosshart Are Not Dismissed For Pre-Indictment Delay

In Defendant's fourth motion, he asks the Court to dismiss Counts Six through Nine, the counts related to the murder of Martin Bosshart, for pre-indictment delay in violation of Defendant's United States Constitution Fifth Amendment due process rights and Sixth Amendment speedy trial rights. Def.'s Mot. at 29-31. The Government opposes. Gov't Opp'n at 57-66.

Statutes of limitation are the "'primary guarantee against bringing overly stale criminal charges.'" United States v. Marion, 404 U.S. 307, 322 (1971) (quoting United States v. Ewell, 383 U.S. 116, 122 (1966)). Accordingly, timely brought criminal prosecutions are only rarely dismissed. See United States v. Cornielle, 171 F.3d 748, 752 (2d Cir. 1999). "An indictment brought within the time constraints of the statute may nevertheless violate due process where

---

District of Virginia); United States v. Gonzalez, 93 F. App'x 268, 270 (2d Cir. 2004) (applying Annabi in analyzing a plea agreement entered into in the District of New Mexico). One unreported Second Circuit decision specifically applies Annabi to an SDFL plea agreement with similar language to the agreement at issue here. See Brown, 2002 WL 34244994, at *2.

pre-indictment delay has been shown to cause 'substantial prejudice' to the defendant's ability to present his defense and 'the delay was an intentional device to gain [a] tactical advantage over the accused.'" Id. (quoting Marion, 404 U.S. at 324.) "The 'defendant bears the heavy burden of proving both that [he or she] suffered actual prejudice because of the alleged pre-indictment delay and that such delay was a course intentionally pursued by the government for an improper purpose.'" United States v. Scala, 388 F. Supp. 2d 396, 399 (S.D.N.Y. 2005) (quoting Cornielle, 171 F.3d at 752 (emphasis in original)). Additionally, "the proof of prejudice must be definite and not speculative." United States v. Birney, 686 F.2d 102, 105-06 (2d Cir. 1982). "Prejudice in this context has meant [the] sort of deprivation that impairs a defendant's right to a fair trial," which is "commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness." Cornielle, 171 F.3d at 752. Furthermore, the Supreme Court has held that to "prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." United States v. Lovasco, 431 U.S. 783, 796 (1977).

Defendant argues first that he is prejudiced by the Government's delay in bringing these charges more than twelve years after Martin Bosshart's murder and three years after charging Defendant's alleged co-conspirators, Todd LaBarca and Michael Roccaforte, in connection with the same murder. Def.'s Mot. at 29. Defendant claims that he is prejudiced because over the past twelve years, potential alibi witnesses have forgotten details of the day of the murder, and many other potential defense witnesses are in witness protection, unreliable due to their drug addictions, missing or have become Government witnesses.[12] Id. at 29-31. According to

---

[12] Defendant identifies the unavailable witnesses as Peter Zuccaro, John Alite, Anthino Russo, David A'Arpino and Kevin Mahon. Def.'s Reply at 22.

Defendant, one of the witnesses has also passed away.  Id.  Next, Defendant argues that the

Government was on notice as early as 2005 that it had evidence to believe Defendant was present

at the murder, even though the witness who stated as much later recanted.  Def.'s Reply at 20.

Therefore, the Government had sufficient time to develop the evidence against Defendant, and it

should have been able to indict him with his co-conspirators in 2011.  Id. at 20-21.  At the very

least, Defendant asks that the Government be required to show the actual investigative purpose

that necessitated the delay, as its "inexplicable delay should be deemed presumptively deliberate

and meant to gain a tactical advantage."  Def.'s Mot. at 29; Def.'s Reply at 20.  To support his

argument, Defendant cites to a case from a district court in the Seventh Circuit, United States v.

Sabath, 990 F. Supp. 1007, 1018 (N.D. Ill. 1998), which critiques the Second Circuit's

requirement that Defendant must show an intentional improper purpose for the Government's

delay.  Def.'s Reply at 21-22.  Specifically, Sabath calls the Second Circuit's requirement that

the Defendant must show intentional bad faith delay "an impossible threshold for criminal

defendants."  Sabath, 990 F. Supp. at 1018.  Defendant also points out that this same language

was highlighted in an Eastern District of New York opinion, United States v. Gross, 165 F. Supp.

2d 372, 380 (E.D.N.Y. 2001), in which the Court found prosecutorial delay.  Def.'s Reply at 22.

Presumably, Defendant submits this language in an attempt to encourage the Court to find that

the Government's delay was presumptively made in order to gain a tactical advantage over

Defendant.

    In its response, the Government argues that Defendant has not been actually and

substantially prejudiced by the delay.  Gov't's Opp'n at 64.  The Government maintains that

Defendant's vague contentions about the unavailability of alibi and other witnesses are

insufficient to establish actual prejudice.  Id.  Furthermore, the Government believes that the

alleged witness who died is the victim's mother, who likely would not have testified on Defendant's behalf.[13] Id. at 64-65. The Government also asserts that many of the witnesses it will call at trial will be the same ones that Defendant claims are unavailable. Id. at 66. As to the bad-faith allegation, the Government contends that it was not until 2009, when Howard Santos, a cooperating witness, made a consensual recording of a conversation with Todd LaBarca, that the Government knew of Defendant's possible involvement in the murder of Martin Bosshart. Id. at 58. The Government then needed to corroborate Defendant's involvement in the murder, fully investigate the murder in relation to the racketeering conspiracy, obtain the cooperation of witnesses and gather other evidence necessary for the Government to prevail at trial. Id. at 62. Thus, the Government argues that the delay was not intentionally done in bad faith to gain a tactical advantage. Id. at 61-63. According to the Government, Defendant was also conspiring with Todd LaBarca to obstruct the investigation into the murder during this time, so that the passage of time cannot be held against the Government. Id. at 58. In particular, Defendant and Todd LaBarca conspired to prevent a possible witness from providing information to law enforcement or testifying in the grand jury. Id.

The Court finds that Defendant has not been substantially prejudiced by the delay. Defendant vaguely points to alibi and defense witnesses that are no longer available to support his position that the Government's delay prejudiced him. Although Defendant lists a few unavailable witnesses in his reply, Defendant neither explains how these witnesses would have helped his defense, nor asserts that any one of them is a key witness. Defendant's broad arguments do not lead this Court to conclude that Defendant faces a deprivation that impairs his

---

[13] Defendant does not address this contention in his reply.

right to a fair trial.  The Court can only label these claims as speculative; therefore, it does not find that Defendant was substantially prejudiced by the delay.

The Court also finds that Defendant has failed to show that the Government's delay was intentionally undertaken in order to gain a tactical advantage over him.  Apart from pointing to the lengths of time between the murder, when the Government should have been on notice of Defendant's involvement, the indictment of Defendant's co-conspirators and the current indictment, Defendant has not offered any arguments or evidence that the Government intentionally delayed in bringing these charges in order to gain a tactical advantage.[14] Essentially, Defendant asks the Court to find, ipso facto, because there was a delay, it must have been intentional.  Without more proof, the Court will not adopt Defendant's arguments.  See, e.g., United States v. Carbonaro, 02 Crim. 743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sep. 30, 2004) (denying defendant's motion to dismiss based on pre-indictment delay where a 14-year-old murder was alleged as a predicate act in defendant's RICO charge because defendant showed no evidence that the government's delay was due to an improper purpose; where the government submitted that it waited to collect sufficient evidence to prove defendant's guilt beyond a reasonable doubt before indicting defendant).

For these reasons, the Court respectfully recommends that the District Judge deny Defendant's motion to dismiss Counts Six through Nine for pre-indictment delay.  The Court

---

[14] Again, Defendant asks this Court to rely on case law from another circuit in its decision. Although the Court acknowledges that Defendant may bear a "heavy burden" in showing pre-indictment delay, it will not ignore the law of this Circuit by relying on the Northern District of Illinois decision cited in Defendant's papers.  In any event, Defendant's position fails under the Northern District of Illinois standard, too, as he has failed to show actual prejudice coupled with the "government's recklessness and lack of legitimate investigatory justification for the delay." Sabath, 990 F. Supp. at 1017.

also declines to recommend that the District Judge require the Government to show what investigative purpose led to the delay, as it is clear from the Government's submissions that the Government did not have a lead on Defendant's involvement in the murder until 2009, that it waited to gather evidence to offer at trial and that Defendant may have been obstructing the Government's investigation in the meantime.

## VI.   The Court Will Not Examine The Grand Jury Minutes

Lastly, Defendant moves for the Court to review in camera the grand jury transcripts to determine if the jury was misled as to Counts Six through Nine.[15]  Def.'s Mot. at 31-37.  The Government opposes.  Gov't's Opp'n at 66-68.

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."  Douglas Oil Co. of Cal. v. Petrol Stops Nw., 441 U.S. 211, 218 (1979). Nevertheless, a court may authorize the disclosure of proceedings held before a grand jury "at the request of a defendant who shows that a ground may exist to dismiss the indictment . . . ." Fed. R. Crim. P. 6(e)(3)(E)(ii).  The Supreme Court has fashioned a three-part analysis to guide courts in determining when to disrupt the secrecy of grand jury proceedings: "[p]arties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice . . . that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed."  Douglas Oil, 441 U.S. at 222.  In other words, a defendant must show a "particularized need" to unseal grand jury minutes, United States v. Weinstein, 511 F.2d 622, 627 (2d Cir. 1975), and a review of grand jury transcripts "should not be permitted without concrete allegations of government

---

[15] Defendant does not cite Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) in his request that the Court examine the grand jury transcript, but it is the applicable rule. See Fed. R. Crim. P. 6(e)(3)(E)(ii).

misconduct." United States v. Leung, 40 F.3d 577, 581 (2d Cir. 1994). A "defendant's 'general and unsubstantiated assertions' of government misconduct [are] insufficient to meet the 'stringent standard' under Rule 6(e)(3)(E)(ii) . . . ." United States v. Martin, 411 F. Supp. 2d 370, 376 (S.D.N.Y. 2006) (citing United States v. Dunn, No. 05 Crim. 127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005)); see United States v. McGrath, 459 F. Supp. 1271, 1273 (S.D.N.Y. 1978) (indicating that a defendant's showing "must include more than unsubstantiated, speculative assertions of improprieties in the proceedings") (internal citation & quotation marks omitted); Chacko v. United States, No. 96 Crim. 519 (JGK), 04 Civ. 2258 (JGK), 2005 WL 1388723, at *7 (S.D.N.Y. June 8, 2005) (defendant "offered no proof that the Government knew that any witness provided false testimony before the grand jury . . . [or] that these witnesses actually gave false testimony at any stage of the proceedings"). "[A] defendant's mere speculation as to what occurred in front of the grand jury does not warrant inspection of the minutes, either by disclosure to defense counsel . . . or through in camera inspection by the Court." United States v. Brown, No. 95 Crim. 168 (AGS), 1995 WL 387698, at *7 (S.D.N.Y. June 30, 1995) (citations omitted).

Furthermore, "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363 (1956). Courts should refuse to quash an indictment even if "all the evidence before the grand jury was in the nature of 'hearsay.'" Id. "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed." Id.; see United States v. Williams, 504 U.S. 36, 54 (1992) (reaffirming the holding in Costello). Additionally, the Supreme Court

has held that prosecutors are not required to disclose exculpatory evidence to the grand jury. Williams, 504 U.S. at 52.

Defendant's argument centers on a recorded conversation that he speculates was the sole evidence the Government shared with the grand jury in which "[Todd] LaBarca appears to agree with [a Government] cooperator's account of how [Martin Bosshart's] murder happened." Def.'s Mot. at 32. Specifically, the cooperator's account suggested that Defendant "jumped out in front of LaBarca and shot Bosshart before LaBarca could do it himself." Id. Defendant maintains that in the recorded conversation, Todd LaBarca makes "no clear statement of agreement" with the cooperator's account. Id. Next, Defendant points to the transcript of Todd LaBarca's sentencing for conspiracy to murder Martin Bosshart before the Southern District of New York, during which Todd Labarca's defense attorney is on record repeatedly indicating that Todd LaBarca was not present for the murder of Martin Bosshart. Id. at 32; Tr. of Todd LaBarca Sentencing attached as Exhibit G to Def.'s Mot. Defendant argues that these two statements: 1) call into question the truthfulness of the cooperator's account of the murder, and by extension, Todd LaBarca's ambiguous agreement therewith, and 2) renders hearsay any statement Todd LaBarca has made about the murder. Id. On this basis, Defendant asks the Court to review the grand jury transcript:

> to determine whether there was any misconduct by the [G]overnment in the presentation of the evidence of the murder insofar as 1) the ambiguous nature of the statements in the recorded conversation was not made clear [unless the grand jury listened to the recording itself], 2) the hearsay nature of the source of the assertion that the defendant committed the crime was not clear to the grand jury, and 3) the apparent inconsistency by the source of the information (LaBarca) between his statement on the recording and his statement (through counsel) to Judge Berman in the Southern District as to whether he was even present was made known to the grand jury.

Id. at 33.[16]

The Government objects, arguing that Defendant has not shown concrete allegations of Government misconduct that would permit disclosure of the grand jury transcripts. Gov't's Opp'n at 67. Instead, the Government categorizes Defendant's argument that it relied solely on hearsay evidence then misrepresented that evidence to the grand jury as baseless assumptions. Id.

---

[16] In his motion, Defendant relies heavily on two lines of Second Circuit case law that, although not overruled by United States v. Williams, 504 U.S. 36, 52 (1992), have been called into question by it. Defendant first relies on United States v. Ciambrone, 601 F.2d 616, 623 (2d Cir. 1979), and United States v. Casamento, 887 F.2d 1141, 1183 (2d Cir. 1989), for the proposition that a "prosecutor should present exculpatory evidence where such evidence is substantial and where it might reasonably be expected to lead the jury not to indict." Def.'s Mot. at 35 (internal quotation marks omitted). Since the Ciambrone and Casamento decisions, however, the Supreme Court has held that "[i]mposing upon [a] prosecutor a legal obligation to present exculpatory evidence in his possession [in a grand jury proceeding] would be incompatible with [the underlying goal of such proceedings]." Williams, 504 U.S. at 52.

Next, Defendant cites to United States v. Estepa, 471 F.2d 1132, 1136-37 (2d Cir. 1972), and United States v. Hogan, 712 F.2d 757, 761 (2d Cir. 1983), for the proposition that heavy reliance on hearsay testimony in the grand jury is disfavored. Def.'s Mot. at 35-36. Hogan, citing Estepa held that a "government prosecutor, in presenting hearsay evidence to [a] grand jury, must not deceive the jurors as to the quality of the testimony they hear." United States v. Hogan, 712 F.2d 757, 761 (2d Cir. 1983). Unfortunately, both cases predate Williams, which has cast doubt on the continuing validity of this line of cases. In reaching the Williams holding discussed above, the Supreme Court cautioned that "[b]ecause the grand jury is an institution separate from the courts, over whose functioning the courts do not preside," no general "'supervisory' judicial authority exists" over grand jury proceedings. Williams, 504 U.S. at 47; see United States v. Jiminez, No. Crim.A. 99-364-08, 2005 WL 3183664, at *12 (E.D. Pa. Nov. 29, 2005) (discussing how the language in Williams shows the Supreme Court's unlikelihood of continuing to uphold the Estepa lines of cases). This language indicates that the Supreme Court would likely not uphold these two lines of cases after Williams, as the Court has questioned whether courts should have any supervisory role over the grand jury. Therefore, the Court declines to rely on either line of cases in reaching its decision. As discussed infra, Defendant has also not made a concrete showing of government misconduct that would permit the Court to view the grand jury minutes, even if these cases were still reliable.

Defendant effectively requests that the Court inspect the grand jury transcript in search of possible Government misconduct. In other words, Defendant makes no allegation of actual misconduct on the part of the Government; rather, Defendant seeks to conscript the Court as his investigator "to determine whether there was any [prosecutorial] misconduct." Def.'s Mot. at 33. A few representative examples from Defendant's motion illustrate that Defendant is unaware of any prosecutorial misconduct tainting the grand jury proceedings:

1.    [T]he ambiguous nature of the statements in the recorded conversation was not made clear <u>unless</u> the grand jury listened to the recording itself. <u>Id.</u> (alterations omitted) (emphasis added).

2.    <u>If</u> the grand jury was led to believe that Labarca had direct knowledge of the [D]efendant's role in the murder based on his being personally present, but in fact he denied [his] presence while admit[ing] he played a role in the plan, <u>then</u> the integrity of the accusation is highly questionable <u>unless</u> there was some other evidence presented . . . . <u>Id.</u> at 35 (emphases added).

3.    [T]he evidence of the recorded conversation <u>might</u> have been presented in summary form by an agent . . . or it <u>might</u> have been presented in the form of the recording itself . . . . <u>Id.</u> at 36-37 (emphases added).

4.    [I]f the basis of the 'probable cause' . . . is solely the statements made on the recorded conversation . . . <u>then</u> the Court should also review that conversation . . . . <u>Id.</u> at 37.

The presence of "ifs," "unlesses," and "mights" in his motion demonstrates that Defendant has no basis for alleging actual prosecutorial misconduct. That the evidence (<u>i.e.</u>, the recorded conversation) the Government possibly presented to the grand jury is susceptible to a misleading presentment is insufficient to warrant disclosure of grand jury proceedings under Rule 6(e)(3)(E)(ii). After all, any piece of evidence could be presented to a grand jury in a misleading fashion. <u>See</u> <u>Williams</u>, 504 U.S. at 54 (noting that "[a] complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was 'incomplete' or 'misleading'"). Defendant has not lodged a concrete, substantiated

allegation of prosecutorial misconduct, but instead asks this Court to hunt for such conduct based on one supposed discrepancy identified by Defendant, to wit, whether Todd LaBarca was present for Martin Bosshart's murder. The resolution of such discrepancies must be reserved for trial, where both parties can attempt to persuade the trier(s) of fact that its version of the facts is accurate.

To be entirely clear, the Court knows of no reason to suspect any prosecutorial misconduct in this case.

Accordingly, the Court respectfully recommends that the District Judge deny Defendant's motion for the Court to examine the grand jury transcript.

## VII.  Conclusion

For the foregoing reasons, the Court respectfully recommends that the District Judge adopt this Court's findings and deny Defendant's pretrial motions in their entirety.

## VIII.  Objections

Objections to this report and recommendation must be filed, with a courtesy copy sent to the Honorable William F. Kuntz II, at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen days of filing. Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. See 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; United States v. Ballares, 317 F. App'x 36, 37-38 (2d Cir. 2008).

Dated:  Brooklyn, New York
          December 15, 2015


                                        _Vera M. Scanlon_
                                        VERA M. SCANLON
                                        United States Magistrate Judge